Filed 5/10/16  P. v. Duenas CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B260924 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA072945) |
| v. | |
| JESUS DUENAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dalia C. Lyons, Judge.  Affirmed as modified.

Julie Schumer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Paul M. Roadarmel, Jr. and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Appellant Jesus Duenas appeals from his judgment of conviction of attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a)) and other counts with true findings on certain gang enhancement allegations (§ 186.22, subd. (b)). He raises the following arguments on appeal: (1) the trial court erred in denying his motion to sever trial on a residential burglary count; (2) the evidence was insufficient to support the intent element on the attempted murder count; (3) the trial court abused its discretion and violated Duenas's Sixth Amendment right of confrontation in admitting evidence of his gang's reputation for violence after the charged crimes; (4) the trial court abused its discretion in admitting evidence of Duenas's ties to the Mexican Mafia while in custody on the charged crimes; and (5) the abstract of judgment must be corrected on the attempted murder conviction. We modify the abstract of judgment to correct a clerical error, but otherwise affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Charges

The Los Angeles County District Attorney charged Duenas with one count of attempted willful, deliberate, and premeditated murder (§§ 664, 187, subd. (a)), one count of assault with a semiautomatic firearm (§ 245, subd. (b)), three counts of unauthorized carrying of a firearm (§ 25850, subd. (a)), one count of receiving stolen property (§ 496, subd. (a)), two counts of misdemeanor resisting a peace officer (§148, subd. (a)), and one count of first degree residential burglary (§ 459). It was alleged that Duenas personally and intentionally discharged a firearm during the attempted murder (§ 12022.53, subds. (b)-(d)) and inflicted great bodily injury during the attempted murder and assault with a semiautomatic firearm (§ 12022.7, subd. (a)). It also was alleged that Duenas committed each felony offense for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)). Duenas pleaded not guilty to each count and denied the enhancement allegations.

---

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

## II.    The Evidence At Trial

### A.    The Prosecution's Case-In-Chief

Duenas was a member of the Roscoe Boulevard Gangsters (RBG), a Hispanic criminal street gang.  Thurman Spencer was a former member of the Playboy Crips gang who recently had moved into the area controlled by RBG.  In or about February 2012, Duenas and another man named Eddie confronted Spencer as he was walking home with his sister.  Duenas and Eddie stared at Spencer from across the street, and Spencer stared back at them.  Eddie asked Spencer about his gang affiliation, and Spencer answered that he had just moved to the area.  Duenas and Eddie identified their gang, and Eddie then physically assaulted Spencer as Duenas stood by watching.  A short time later, Spencer and his father-in-law went looking for Duenas and Eddie, and found them in front of an apartment building.  Spencer and Eddie then engaged in another physical fight while Duenas ran away.  Later that month, Spencer had a second confrontation with Duenas. Spencer was driving his truck when he saw that Duenas was a passenger in another car. Duenas made gang signs at Spencer as well as a hand gesture simulating a gun.  Spencer got out of his truck, approached Duenas, and said to him in an aggressive manner, "What's up."  Spencer was ready to fight Duenas at that time, but the car occupied by Duenas drove away.

On March 9, 2012, Spencer and his uncle, Edward Menhaffy, were walking along the sidewalk near Roscoe Boulevard and Columbus Avenue in Los Angeles County. Duenas's girlfriend, Jessica Parades, was driving her car on Roscoe Boulevard; Duenas was seated in the front passenger seat.  The car was moving slowly due to heavy traffic. Spencer recognized Duenas from their previous encounters, and the two men made eye contact with each other.  Spencer told Duenas, "What's up."  Duenas continued looking at Spencer as Parades pulled her car into a nearby driveway next to a Panda Express restaurant.  Duenas exited the vehicle, walked backward toward an alleyway behind the Panda Express, and repeatedly called to Spencer to follow him.  Spencer, who was unarmed, followed Duenas, believing that they were about to engage in a fistfight.

As Duenas and Spencer walked toward the alley, they argued and cursed at one another.  Duenas made a reference to his gang, RBG, then reached toward his waistline and pulled out a gun.  Menhaffy, who was standing nearby, told Spencer, "Let's go, he's got a gun."  As soon as Spencer saw the gun, he stopped walking toward Duenas and kept his arms down by his sides.  Duenas pointed the gun at Spencer, closed one or both of his eyes, and fired a shot.  Spencer turned as soon as the shot was fired, and the bullet struck him in his upper left arm.  Spencer and Menhaffy then ran from the alley to their nearby home.  Duenas returned to Parades's car and fled the scene.

Shortly before the shooting, Los Angeles Police Officer David Torres was off duty and driving home in his personal vehicle.  As Officer Torres was traveling westbound on Roscoe Boulevard, he observed Duenas in the front passenger seat of a car looking over his shoulder at two Black men on the sidewalk.  After the car pulled into the driveway of a shopping center, Duenas exited the vehicle and began walking briskly in the direction of the other men.  At one point, Officer Torres saw Duenas stop, peek around a corner, and lift his shirt while reaching toward his waistband area.  Officer Torres lost sight of Duenas after he turned the corner and ran up an alleyway.  A few seconds later, Officer Torres saw the two other men running from the area.  Because the situation was suspicious, Officer Torres turned his vehicle around and drove back to the shopping center, but he was unable to locate Duenas or the other men.  As he was driving, Officer Torres noticed that Parades had pulled her car into a nearby gas station and appeared to be nervous.  Officer Torres called the police, described what he had observed, and provided the location and license plate number of Parades's car.

At the time of the shooting, Los Angeles Police Officers Larry Hernandez, Robert Beaty, and Jafar Rasool were in a marked police vehicle.  Shortly after receiving a radio call about the shooting, the officers observed Parades's car and began following it.  Once a police helicopter arrived in the area, Officer Hernandez initiated a traffic stop.  As Parades pulled over to the side of the road, Duenas exited the car and ran toward a nearby apartment complex.  Officer Hernandez detained Parades at the car while other officers pursued Duenas on foot.  During the chase, Duenas tossed a handgun over a fence.  He

4

was then apprehended by the officers. As Duenas was being escorted to a police vehicle, he stated: "Yeah, so what? I did it. I'm 19 years old. I'll be doing the rest of my life." Duenas also indicated that Parades was not involved and had no knowledge of the shooting.

The police recovered several items of women's jewelry, including rings, earrings, and a necklace, from Duenas's pocket during a search of his person. The police also recovered a nine-millimeter semi-automatic handgun that Duenas had tossed over a fence during the foot chase. There was a round in the chamber and an additional three rounds in the magazine. The round in the chamber had a marking on its end that was consistent with the gun malfunctioning as the trigger was pulled. During the booking process at the police station, Duenas stated, "I can't believe that black guy snitched on me for getting shot."

The recovered handgun was registered to Richard Frischke, who previously had reported to the police that his gun had been stolen during a home burglary. According to Frischke, on January 9, 2012, he left his home in Los Angeles County around 4:00 p.m. and returned later that night. Upon returning, he discovered that a number of his belongings had been tossed onto the floor and that an iPad, ammunition, and two semi-automatic firearms, including a nine-millimeter handgun, had been taken. Frischke immediately reported the burglary to the police.

Duenas was linked to another home burglary that occurred in Los Angeles County on January 19, 2012. On that day, Cassandra Angel left home around 8:00 a.m. and returned in the late afternoon to find that the home had been ransacked. Two laptops and her mother's jewelry were missing. After Angel called 911, the police responded to the home and recovered latent print evidence. A fingerprint found on a closet door in the home was later matched to Duenas.

Officer Jafar Rasool testified as a gang expert for the prosecution. According to Officer Rasool, Hispanic street gangs in Southern California operate under the umbrella of the prison gang, the Mexican Mafia, and are required to pay the Mexican Mafia a portion of the revenues generated from their criminal gang activities. RBG began as a

5

tagging crew and became a criminal street gang that pledged allegiance to the Mexican Mafia in 2010. As of March 2012, RBG had 15 to 25 active members and used the letters "C" and "R" as a common identifying sign or symbol. The primary activity of the gang was to raise revenue by committing burglaries, robberies, and other property crimes. In support of these activities, RBG also committed acts of violence to protect their territory from rivals and to prevent residents in the community from reporting their crimes. Spencer's shooting occurred within the geographic territory claimed by RBG. In June 2012, a few months after the shooting, a larger Hispanic gang called the Columbus Street Gang (CSG) approached RBG about a possible merger because CSG was attracted to RBG's reputation for violence. RBG agreed to be absorbed into CSG and thereafter became a clique of CSG with its members now identifying themselves as "Columbus Street, Roscoe Boulevard Gangsters."

Officer Rasool testified that Duenas was a self-admitted member of RBG with prominent gang tattoos and the gang moniker, "Maniac." Duenas also was a current member of the RBG clique of CSG. On several occasions, Duenas had been observed by law enforcement officers in RBG territory associating with other RBG members. In one specific instance, Duenas was seen in the company of a fellow gang member who later was found to be in possession of the other firearm that had been stolen during the Frischke burglary.

When presented with a hypothetical based on the facts of this case, Officer Rasool opined that the crimes would have been committed for the benefit of a criminal street gang. Officer Rasool explained that, when a Hispanic gang member is challenged to a fight by a perceived Black gang member, it is considered a sign of disrespect against the entire gang. The shooting of the Black gang member would serve to elevate the reputation of the shooter by showing his willingness to engage in violence on behalf of the gang. The shooting also would allow the gang to protect its revenue stream by instilling fear and intimidation within the community and among rival gangs. Officer Rasool further testified that a gang member's possession of a firearm and jewelry that had been stolen in prior burglaries would increase the gang's revenue stream and enable it to

6

continue its criminal enterprise.  Officer Rasool opined that the jewelry would be sold by the gang member with a portion of the proceeds given to the gang while the firearm would be used to facilitate the commission of other gang crimes.

### B.     The Defense Case

Duenas testified on his own behalf.  He joined RBG in 2009 and was a member of the gang at the time of the shooting.  According to Duenas, Spencer was the aggressor in each of their encounters.  During the first encounter, Spencer flashed a gang sign at Duenas's fellow RBG member, Eddie, as they were walking across the street.  Eddie went to confront Spencer, and Duenas followed.  Upon realizing that Spencer was with his younger sister, Duenas told Spencer that he should have some respect for himself and his family.  Spencer replied, "I don't . . . give a fuck.  I'm just trying to let you know where I'm from."  Eddie then punched and kicked Spencer while Duenas walked away.  Later that day, Spencer and another man approached Duenas and Eddie as they were leaving Duenas's house.  Duenas saw Spencer with a gun and immediately ran away.

During the second encounter, Duenas was the passenger in a car driven by Parades when Spencer pulled up next to them at a stoplight.  Menhaffy and two other men were passengers in Spencer's vehicle.  Upon seeing Duenas, Spencer mimicked a gunshot sound, which caused Duenas to grab Parades and pull her down.  Spencer and his companions laughed at Duenas, and Spencer called Duenas a "bitch."  Spencer then exited his vehicle and tried to open the front passenger door of Parades's car, but the door was locked.  After Parades drove away, Spencer returned to his vehicle and followed Duenas and Parades until they were able to evade him.

On the day of the shooting, Duenas was in the front passenger seat of Parades's car when he saw Spencer and Menhaffy walking across the street.  Duenas was armed with a gun at the time due to his prior altercations with Spencer.  Upon seeing Duenas, Spencer made a gesture with his hand to mimic pulling a trigger.  He also appeared to mouth the words, "I'm going to smoke you."  When Parades stopped her car in traffic, Spencer began walking toward them.  Duenas immediately exited the car and ran toward

7

the back of the Panda Express restaurant because he did not want to endanger Parades, who was then three months pregnant. Spencer followed Duenas and told him, "Quit being a bitch. Catch my face. What's up." Spencer held his right hand behind his back as he approached Duenas, which caused Duenas to fear that Spencer had a gun. Duenas became more afraid when he saw Menhaffy walking toward him and heard Spencer tell Menhaffy, "Hey, nigga, let's pack this fool out." As Duenas continued backing away from the men, he pulled out his gun, closed both eyes, and fired one shot. According to Duenas, he pointed the gun near Spencer's arm, but did not intend to hit him and instead fired the gun out of fear. Duenas then opened his eyes and saw Spencer and Menhaffy running away. Immediately after the shooting, Duenas ran to a friend's house and called Parades to come pick him up. As Parades and Duenas were heading home in her car, the police initiated a traffic stop and Duenas tried to avoid arrest by running away.

On cross-examination, Duenas admitted that he burglarized the Angel residence and sold the items he had stolen. Duenas also admitted that he acquired the loaded firearm that he used in the shooting of Spencer from a fellow RBG member. Duenas acknowledged that RBG members would commit vandalism, robberies, and residential burglaries, and would share the proceeds of their theft-related crimes with other members. Duenas further explained that a member of RBG could elevate his status in the gang by committing violent crimes, but denied he ever committed any crimes to enhance his gang reputation. After RBG merged with CSG, Duenas remained a member of the gang and began identifying himself as "Maniac from Columbus Street, Roscoe Boulevard" while in custody.

Duenas admitted that he sold drugs in jail and conspired with Parades and various gang members to transport the drugs into the jail facility. He insisted, however, that he did so for his personal benefit and not for his gang. Duenas denied that he was interested in elevating his status or acquiring a position of authority in jail when he engaged in drug sales activity. In a recorded jailhouse call to Parades, however, Duenas stated that he was waiting from authorization from "the 900s upstairs" to be the "shot caller," or person in charge, of his jail dormitory. In other recorded calls, Duenas spoke with a secretary for

8

the Mexican Mafia about his drug sales.  At trial, Duenas testified that he was obligated to disclose his drug sales to the Mexican Mafia and to provide the gang with one-third of the proceeds from his sales, and that if he refused, he could be seriously injured or killed. Duenas also testified that he was chosen to be the shot caller for his jail dormitory and that he had to cooperate or he would suffer serious consequences.

### C.    The Prosecution's Rebuttal

Los Angeles County Sheriff's Deputy Cory Mattice monitored Duenas's telephone calls in jail and was an expert on the Mexican Mafia.  According to Deputy Mattice, the Mexican Mafia, which has approximately 50 members, controls all of the Hispanic gangs in Southern California.  Within the jail system, the Mexican Mafia appoints one inmate to serve as the "head shot caller" for each jail facility.  The head shot callers in turn appoint lower level shot callers or representatives to control particular floors or dormitories in the jail.  A shot caller is considered to have a position of power and status within the jail system.  An inmate typically is appointed to be a shot caller by "put[ting] in work" for the Mexican Mafia, such as selling drugs; the gang will not appoint shot callers who are unwilling to accept the position.  The Mexican Mafia relies on drug sales from inmates to make money, and inmates who successfully sell drugs in jail can elevate their status within the gang.  Following his arrest, Duenas was housed on the 800 floor of the North County Correctional Facility.  Certain inmates on the 900 floor, who were segregated from the general jail population, were in charge of appointing the lower level shot callers for the dormitories in that facility.

## III.   Verdict and Sentencing

The jury found Duenas guilty on each of the nine counts.  The jury also found each firearm enhancement and great bodily injury enhancement to be true.  As to the counts for unauthorized carrying of a firearm, receiving stolen property, and first degree residential burglary, the jury found the gang enhancements to be true.  The jury deadlocked on the gang enhancements as to the attempted murder and assault counts, and as to whether the attempted murder was willful, deliberate, and premeditated.  The trial

9

court declared a mistrial as to the deadlocked allegations and thereafter granted the prosecution's motion to dismiss them.  Duenas was sentenced to a total term of 41 years to life in state prison.

## DISCUSSION

**I.      Denial of the Motion to Sever the Residential Burglary Count**

Duenas argues that the trial court abused its discretion when it denied his motion to sever the first degree residential burglary charge regarding the burglary of the Angel residence from the other charges.  He also asserts that the alleged error violated his federal constitutional rights to due process and a fair trial.

### A.      Relevant Law

"'The law favors the joinder of counts because such a course of action promotes efficiency.' [Citation.]" (*People v. Scott* (2015) 61 Cal.4th 363, 395.)  Section 954, which governs the joinder of criminal counts, states in pertinent part:  "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately. . . ." (§ 954.)  Where the threshold statutory requirements for joinder are met, the "'"defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying [the] defendant's severance motion."'" [Citation.]  That is, [the] defendant must demonstrate the denial of his motion exceeded the bounds of reason. [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 848.)

"'Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or

10

all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns into a capital case.' [Citation.]" (*People v. Scott*, *supra*, 61 Cal.4th at pp. 395-396.) "'In determining whether a trial court abused its discretion . . . in declining to sever properly joined charges, "we consider the record before the trial court when it made its ruling."' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 798.) "'A pretrial ruling that was correct when made can be reversed on appeal only if joinder was so grossly unfair as to deny due process.' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 575.)

## B.     The Denial of the Severance Motion Was Proper

Duenas contends that the trial court erred in denying his motion to sever the first degree residential burglary count because the burglary of the Angel residence was unconnected to, and in a different class from, the other charged offenses, each of which was related to the shooting of Spencer. Duenas also claims that the error was prejudicial because the evidence supporting the burglary count would not have been cross-admissible, was likely to inflame the jury, and was stronger than the evidence supporting the attempted murder count. We conclude that Duenas's claim lacks merit.

The statutory requirements for joinder were satisfied in this case. The residential burglary charge in count 13 involving the Angel burglary was of the same class of crimes as the receiving stolen property charge in count 10 involving the Frischke burglary because both offenses constituted "crimes against property." (*People v. Grant* (2003) 113 Cal.App.4th 579, 586 [burglary and receiving stolen property were of the same class of crimes for purposes of section 954].) The two counts were also connected in their commission within the meaning of section 954 because both crimes occurred within a 10-day period and "involved a felonious intent to obtain property." (*People v. Romero and Self* (2015) 62 Cal.4th 1, 29 [burglary and receiving stolen property counts were properly joined with other counts where the crimes all occurred within a two-month period and involved a felonious intent to obtain property].) The receiving stolen property count in turn was connected in its commission to the other charged offenses related to the Spencer

11

shooting because the stolen property at issue in that count was the semiautomatic firearm that was used in the shooting. Because section 954's threshold requirements for joinder were met, Duenas can only establish error in the denial of his severance motion by making a clear showing of prejudice.

In support of his argument that the trial court abused its discretion in declining to sever the residential burglary count, Duenas asserts that the evidence supporting that count would not have been cross-admissible in a trial on the other charged offenses, including the receiving stolen property count. Duenas reasons that any similarities between the Angel burglary and the Frischke burglary are irrelevant to showing cross-admissibility because he was not charged with the burglary of the Frischke residence, but rather with receiving property (i.e., a firearm) that was stolen in that burglary. Duenas thus contends that the evidence that he committed the Angel burglary could not have been offered to prove that he committed the Frischke burglary or that he acted pursuant to a common plan when he received property stolen from the Frischke residence by someone else. However, even assuming, without deciding, that the evidence supporting the Angel residence burglary would not have been cross-admissible, it is well-established that "'the absence of cross-admissibility does not, by itself, demonstrate prejudice.'" (*People v. Vines* (2011) 51 Cal.4th 830, 856; see also *People v. Johnson* (2015) 61 Cal.4th 734, 751 ["absence of cross-admissibility cannot alone establish the substantial prejudice necessary to make severance mandatory"].) Where, as here, the charges were properly joinable under section 954, we must consider whether the other severance factors support a clear showing of prejudice. (*People v. Johnson*, *supra*, at p. 751; *People v. Trujeque* (2015) 61 Cal.4th 227, 259.)

Based on the record before the trial court in ruling on the severance motion, Duenas has failed to demonstrate prejudice. Contrary to Duenas's claim, the residential burglary count was not more inflammatory than the other charged offenses, including the attempted murder and assault counts. The burglary count alleged that Duenas broke into the Angel residence when no one was home and stole two laptops and some jewelry for the benefit of his gang. The attempted murder and assault counts alleged that Duenas

12

intentionally shot an unarmed victim after luring him to an alley because he believed the victim had disrespected Duenas's gang. (*People v. Romero and Self*, *supra*, 62 Cal.4th at p. 30 [burglary and receiving stolen property counts were not more inflammatory than murder and attempted murder counts for purposes of joinder under section 954]; *People v. Scott*, *supra* 61 Cal.4th at p. 396 [joinder of burglary and murder counts was proper where evidence of burglaries was unlikely to inflame the jury as compared to evidence of sexual assault and murder].)

We likewise reject Duenas's contention that the evidence underlying the attempted murder and assault counts was significantly weaker than the evidence underlying the residential burglary count. The evidence supporting each of the charges was strong. On the burglary count, Duenas's fingerprint was recovered from inside the Angel residence, and he was found to be in possession of several items of women's jewelry at the time of his arrest. On the attempted murder and assault counts, both Spencer and his uncle identified Duenas as the shooter and described the prior physical confrontations that had taken place between Duenas and Spencer. In addition, their respective accounts of Duenas acting as the aggressor immediately prior to the shooting were corroborated by Officer Torres, who happened to be driving in the area when the incident occurred. There was also evidence that, shortly after the shooting, Duenas attempted to flee from the police and to get rid of the stolen firearm that he had used to shoot Spencer. Duenas then made incriminating statements to the police about his involvement in the shooting when taken into custody. Because Duenas has not made a clear showing of prejudice in the joinder of the charges alleged against him, the trial court did not abuse its discretion in denying his severance motion.

Duenas also has failed to show that joinder of the charges resulted in a violation of his federal constitutional rights. In evaluating Duenas's constitutional claim, "'we must . . . inquire whether events after the [trial] court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of defendant's constitutional right to fair trial or due process of law.' [Citation.]" (*People v. O'Malley* (2016) 62 Cal.4th 944, 969-970.) Duenas argues that joinder of the charges deprived him of a fair trial because

13

the prosecution improperly used the evidence of the Angel residence burglary to bolster an otherwise weak case as to the gang enhancement allegations on the remaining counts. We disagree. The jury made true findings as to the gang enhancements on the unauthorized carrying of a firearm, receiving stolen property, and residential burglary counts, and deadlocked as to the gang enhancements on the attempted murder and assault counts. The jury's verdict reflects that it separately considered each count and each gang enhancement allegation. Furthermore, there was compelling evidence to support the gang enhancements that the jury found to be true. The prosecution's gang expert testified that the primary activity of Duenas's gang, RBG, was to raise revenue by committing burglaries, robberies, and other property crimes. In his testimony, Duenas confirmed that members of RBG would commit robberies and burglaries and would share the proceeds of these crimes with the gang. Duenas also admitted that he obtained a loaded firearm that he carried on his person and used in the shooting of Spencer from a fellow RBG member, who later was found to be in possession of the second firearm that was stolen from the Frischke residence. On this record, the joinder of the residential burglary count with the other charged offenses did not deny Duenas a fair trial or due process of law.

## II.     Sufficiency of the Evidence on the Attempted Murder Count

Duenas next challenges the sufficiency of the evidence supporting his conviction for the attempted murder of Spencer. Duenas contends that the evidence was insufficient to support a finding that he acted with a specific intent to kill when he fired a single shot at Spencer and struck him in the arm.

### A.     Relevant Law

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict - i.e., evidence that is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review

the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citation.]" (*People v. Ervine* (2009) 47 Cal.4th 745, 785.) "Although motive is often probative of an intent to kill, the absence of a clear motive does not demonstrate the lack of an intent to kill." (*People v. Houston* (2012) 54 Cal.4th 1186, 1218.) As the California Supreme Court has explained, "'[t]here is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.] The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill. . . ." [Citation.]' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Moreover, "'"[t]he fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance. Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind." [Citation.]' [Citation.]" (*Ibid*.)

### B.      Substantial Evidence Supported the Attempted Murder Conviction

The totality of the evidence in this case was sufficient to support a finding that Duenas acted with a specific intent to kill. Duenas's prior physical confrontations with

15

Spencer provided a motive for the shooting. In particular, the evidence showed that Duenas was a member of a Hispanic gang and that he perceived Spencer, who is Black, as a hostile gang member. During their first meeting, Duenas's fellow RBG member physically assaulted Spencer following a gang challenge, and on another occasion, Duenas made gang signs at Spencer as well as a hand gesture simulating a gun. The prosecution also presented evidence that, on the day of the shooting, Duenas exited a car when he saw Spencer walking on the sidewalk and repeatedly called to Spencer to follow him to an alley. As Spencer stood with his arms by his sides, Duenas pulled a semiautomatic handgun from his waistband, aimed the gun at Spencer, and fired a shot that struck Spencer in the arm. Duenas then fled the scene and led the police on a foot chase as he tried to evade arrest and to dispose of the gun. From this evidence, the jury reasonably could have inferred that Duenas intended to kill Spencer because he fired a shot directly at Spencer in a manner that could have inflicted a mortal wound. The jury also reasonably could have inferred that Duenas exhibited consciousness of guilt when he attempted to flee and to hide evidence, and then told the police upon his arrest, "Yeah, so what? I did it. I'm 19 years old. I'll be doing the rest of my life."

Duenas argues that he lacked a specific intent to kill because the evidence showed that he aimed at a non-vital area of Spencer's body when he fired the gun. However, Spencer's uncle, Menhaffy, testified that Duenas "pointed [the gun] toward [Spencer's] chest," and that Spencer "moved to the side" as the shot was fired. In his interview with the police, Spencer stated that Duenas "shut one eye and took aim before he pulled the trigger." While Duenas testified that he pointed the gun at Spencer's arm and shot him in self-defense because he feared Spencer might be armed, it was the exclusive province of the jury to determine the credibility of the witnesses and the weight to be accorded their testimony. Duenas also asserts that he did not shoot Spencer at close range because the evidence showed he fired from a distance of 13 to 19 feet. However, Duenas has failed to cite to any authority to establish that firing a gun from such a distance is insufficient to support an inference of intent to kill. (See *People v. Perez* (2010) 50 Cal.4th 222, 230 [intent to kill could be inferred where defendant fired a single shot at a group of eight

16

people from a distance of 60 feet]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224 [intent to kill could be inferred where defendant fired multiple shots into an occupied vehicle from a distance of 25 feet].)  Viewing the evidence in the light most favorable to the verdict, the jury reasonably could have found that Duenas intended for his shot to be fatal and that the bullet missed its mark.

## III.    Admission of Evidence on the Absorption of Duenas's Gang

Duenas contends that the trial court prejudicially erred in admitting evidence that, after the commission of the charged crimes, Duenas's gang, RBG, was absorbed by a larger gang, CSG, because of RBG's reputation for violence.  Duenas asserts that the evidence should have been excluded because it was irrelevant to the issues to be tried to the jury and was unduly prejudicial.  Duenas also argues that the admission of the evidence violated his Sixth Amendment right of confrontation.

### A.    Admissibility Under the Evidence Code

Duenas claims that the evidence that CSG absorbed RBG based on its reputation for violence lacked any probative value because the alleged acquisition occurred after the commission of the offenses charged in this case.  Duenas also contends that the evidence was unduly prejudicial because it allowed the jury to infer that he had a propensity for violence and must therefore be guilty of the attempted murder of Spencer.

The rules pertaining to the admissibility of evidence are well-established.  "Only relevant evidence is admissible at trial.  [Citation.]  Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  A trial court has 'considerable discretion' in determining the relevance of evidence.  [Citation.]  Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.]"  (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)  Evidence is unduly prejudicial under Evidence Code section 352 if it """"uniquely tends to evoke an emotional bias against a party as an individual, while having only slight

probative value with regard to the issues."'"" (*People v. Carter* (2005) 36 Cal.4th 1114, 1168.) "'[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question. . . .' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) "We will not reverse a court's ruling on such matters unless it is shown '"the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*People v. Merriman*, *supra*, at p. 74.)

To prove a gang enhancement allegation, the prosecution must establish that the crime at issue was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) "[A]s a general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative. [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) "Evidence of the defendant's gang affiliation – including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like – can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Additionally, "expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation." (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.) Nevertheless, because gang evidence may have a inflammatory impact on the jury, the trial court "'should carefully scrutinize such evidence before admitting it.'" (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.)

Here, the trial court permitted the prosecution's gang expert, Officer Rasool, to testify that, in June 2012, Duenas's gang, RBG, was absorbed by a larger gang, CSG, because of RBG's reputation for violence. In ruling of the admissibility of the proffered testimony, the trial court agreed with the prosecutor that it was relevant to showing that

18

RBG committed acts of violence to enhance the reputation of the gang, which supported Officer Rasool's opinion that the crimes committed by Duenas would have benefited his gang by elevating the reputation of RBG and enabling it to continue its criminal business. We conclude, however, that the evidence was not probative of any material disputed issue, including a gang motive for the charged crimes, because CSG's acquisition of RBG occurred months after Duenas's commission of those crimes. While RBG's pre-offense reputation for violence may have been probative of whether Duenas committed the offenses for the benefit of the gang, Officer Rasool already had testified about the violent reputation developed by RBG prior to the charged crimes. The evidence of CSG's acquisition of RBG was also prejudicial because it created a risk that the jury would improperly infer that Duenas had a propensity for violence based on the violent reputation of his gang and was thus guilty of the crimes charged in this case. Because the evidence was more prejudicial than probative, it should have been excluded. However, as discussed in section III.C. below, the error in admitting the evidence was harmless.

###### B.     Alleged Violation of the Sixth Amendment Right of Confrontation

Duenas argues that the admission of the evidence concerning CSG's absorption of RBG violated his Sixth Amendment right to confront and cross-examine witnesses under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). He specifically asserts that the evidence constituted testimonial hearsay because it was based on information provided by individuals who did not testify at trial and were not subject to prior cross-examination.

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) In *Crawford*, the United States Supreme Court held that the Sixth Amendment right of confrontation bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior

19

opportunity for cross-examination." (*Crawford*, *supra*, 541 U.S. at pp. 53-54.)[2] The Supreme Court in *Crawford* noted, however, that the confrontation clause does not "bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted," that is, for non-hearsay purposes. (*Id*. at p. 59, fn. 9.)

Duenas contends that the admission of Officer Rasool's testimony about CSG's acquisition of RBG violated his right of confrontation because it was based on testimonial hearsay that was provided to the officer by high-ranking members of CSG and was offered for the truth of the matter asserted. As the parties acknowledge, the issue of whether the Sixth Amendment right of confrontation is violated by a gang expert's reliance on testimonial hearsay is currently pending before the California Supreme Court. (*People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681; *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640.) In this case, it appears the out-of-court statements provided to Officer Rasool about CSG's acquisition of RBG were not testimonial in nature, and thus, not subject to the confrontation clause. As Officer Rasool explained at an Evidence Code section 402 hearing on the matter, he obtained the information about the reasons for CSG's acquisition of RBG from "conversations [with] the more influential members of [CSG]." There is no indication in the record that these conversations took place during a custodial

---

**2** Although the United States Supreme Court did not define the term "testimonial" in *Crawford*, it later provided the following guidance: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822.) While acknowledging that the high court has not agreed on a definition of "testimonial," the California Supreme Court has described testimonial statements for purposes of *Crawford* as having two critical components: "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*People v. Dungo* (2012) 55 Cal.4th 608, 619.)

interrogation or that Officer Rasool's primary purpose in talking to these CSG gang members was to target Duenas or any particular individual for criminal prosecution. (*People v. Valadez* (2013) 220 Cal.App.4th 16, 35-36 [general background information on gangs obtained through casual, consensual encounters with gang members was not testimonial]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1135-1136 [statements obtained in conversations with gang members, both in and out of custody, but not with an eye toward prosecuting any particular defendant, were not testimonial].) As the United States Supreme Court has observed, "not all those questioned by the police are witnesses" for purposes of the Sixth Amendment and "not all 'interrogations by law enforcement officers,' [citation], are subject to the Confrontation Clause." (*Michigan v. Bryant* (2011) 562 U.S. 344, 355 quoting *Crawford*, *supra*, 541 U.S. at p. 53.)

Even if it was not testimonial, however, the evidence appears to be inadmissible hearsay. Although it is well-established that a gang expert may rely on hearsay evidence that is offered as the basis of his or her opinion, the expert may not use the out-of-court statements of others to "transform inadmissible matter into 'independent proof' of any fact." (*People v. Gardeley* (1996) 14 Cal.4th 605, 619; see also *People v. Baker* (2012) 204 Cal.App.4th 1234, 1236 ["[a]lthough qualified experts may rely upon and testify to the sources on which they base their opinions, including hearsay . . ., they may not relate the out-of-court statement of another as independent proof of the facts asserted in the out-of-court statement"].) In other words, an expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay. Here, Officer Rasool did not attempt to connect his out-of-court conversations with gang members about CSG's acquisition of RBG to his expert opinion about whether the charged crimes were committed for the benefit of a gang. Instead, Officer Rasool simply recited what he had been told by high-ranking members of CSG about the circumstances surrounding the acquisition.

Ultimately, however, we need not decide whether Officer Rasool's statement about CSG's acquisition of RBG was based on testimonial hearsay, and if so, whether its admission violated Duenas's Sixth Amendment right of confrontation. Even assuming that the evidence was erroneously admitted, we conclude that such error was harmless for

21

the reasons set forth in section III.C. below. (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661 ["[v]iolation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless"].)

### C.     Any Error in Admitting the Evidence Was Harmless

There was overwhelming evidence of Duenas's guilt on each of the charged offenses and on the gang enhancements that the jury found to be true. With respect to the counts for attempted murder and assault with a semiautomatic firearm, Duenas admitted that, following a series of physical confrontations with Spencer, he was a passenger in his girlfriend's car and carrying a loaded semiautomatic handgun when he saw Spencer walking on the sidewalk. Duenas also admitted that, after leading Spencer to an alleyway behind a restaurant, he pulled the gun from his waistband, pointed it "toward [Spencer's] direction . . . by his arm's side," and then fired a shot that struck Spencer in his upper arm. While Duenas testified that he feared Spencer might be armed at the time because he was walking with his hand behind his back, it was undisputed that Duenas never actually saw Spencer or his uncle with a weapon. The uncontroverted evidence further established that, shortly after the shooting, Duenas led the police on a foot chase as he tried to evade arrest and to dispose of the gun, and then made incriminating statements to the police about his culpability in the crime, thus exhibiting consciousness of guilt. The fact that the jury found Duenas guilty of attempted murder and assault while deadlocking on the gang enhancements alleged as to those counts shows that it separately considered each count and enhancement allegation.

With respect to the counts for unauthorized carrying of a firearm, receipt of stolen property, and residential burglary, there was uncontroverted evidence of Duenas's guilt on both the underlying counts and the associated gang enhancements. In particular, Duenas admitted that he was an active member of the RBG gang at the time of these offenses, that members of his gang would commit robberies and residential burglaries, including thefts of guns, and that they would share the proceeds of their thefts with the

22

gang. Duenas also specifically admitted that he committed the Angel burglary, that he acquired the firearm that was stolen during the Frischke burglary from a fellow RBG member, and that he carried that stolen firearm on his person before using it in the Spencer shooting. Officer Rasool similarly confirmed in his testimony that the primary activity of RBG was to raise revenue by committing burglaries and robberies and that firearms stolen during the course of these crimes were often used to facilitate other acts of violence committed by the gang. Officer Rasool further opined that a gang member's possession of a firearm and other property stolen in a burglary would benefit the gang by increasing its revenue stream and allowing the gang to continue its criminal activities.

In addition to the compelling evidence of Duenas's guilt, the record reflects that the evidence about CSG's absorption of RBG was limited in scope and largely cumulative of other admissible evidence concerning RBG's habits, customs, and activities. In testifying about the gang, Officer Rasool explained that, since its formation in 2010, RBG had engaged in acts of violence to enhance its reputation and its revenue stream. With respect to CSG's absorption of RBG, Officer Rasool simply testified that, in June 2012, the leaders of CSG approached the leaders of RBG about a possible merger because of RBG's reputation for violence, and that RBG thereafter agreed to become a clique of CSG with its members now identifying themselves "Columbus Street, Roscoe Boulevard Gangsters." Officer Rasool never testified that Duenas was involved in any discussions between the two gangs, or that Duenas's crimes contributed to CSG's decision to approach RBG about a merger. Officer Rasool's testimony that RBG's reputation for violence later led to it being acquired by CSG added very little to the other evidence about the gang that was properly before the jury.

Considering the totality of the evidence presented at trial, we are convinced beyond a reasonable doubt that the jury would have reached the same verdict on the underlying counts and the gang enhancements had the evidence of CSG's acquisition of RBG been excluded. Accordingly, under any standard, any error in admitting the evidence was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [state law error is harmless if it is not reasonably probable that a result more favorable to defendant would

23

have occurred absent the error]; (*Chapman v. California* (1967) 386 U.S. 18, 24 [reversal for constitutional error not required if error is harmless beyond a reasonable doubt].)

## IV.   Admission of Evidence of Duenas's Ties to the Mexican Mafia

Duenas argues that the trial court prejudicially erred in denying his motion for a mistrial based on the admission of evidence of his ties to the Mexican Mafia while in custody on the charged crimes.  Duenas argues that the evidence was highly prejudicial and that its admission violated his constitutional right to due process and a fair trial.

### A.      Relevant Background

Prior to Duenas's testimony, the parties discussed with the trial court the evidence that could be used to impeach him.  The prosecutor sought to introduce evidence of two pending criminal cases that involved Duenas conspiring with others to smuggle drugs into the county jail during his custody in this case.  Defense counsel objected to the admission of the evidence and argued that certain aspects were highly prejudicial, including that the drug at issue was heroin, that Duenas's former attorney was one of the co-conspirators, and that Duenas was communicating with the Mexican Mafia about the smuggling.  The prosecutor stated that she did not intend to introduce evidence of Duenas's ties to Mexican Mafia unless "the door is opened by Mr. Duenas," but the fact that he conspired with other gang members to smuggle drugs into the jail was relevant to his gang "membership, allegiance, [and] proclivity to commit crimes for the gang."  The trial court ruled that the prosecutor could present evidence that Duenas smuggled drugs into the jail with other gang members, but could not make reference to the Mexican Mafia, Duenas's former attorney, or heroin at that time.  The court advised the prosecutor to request a further hearing in the event that Duenas "opened the door" to evidence of his relationship with the Mexican Mafia.

During cross-examination, Duenas testified that he had no option but to claim his membership in RBG and CSG because he was in custody.  He admitted that members of RBG could move up in the ranks of the gang by committing violent crimes, but denied that he ever committed any crimes to elevate his status within the gang.  While Duenas

24

admitted that he sold drugs in jail, he stated that he did so for his own financial gain and not to benefit his gang or to enhance his status in jail. Duenas insisted that he was not concerned about status when he was in or out of custody.

Outside the presence of the jury, the prosecutor argued to the trial court that Duenas now could be impeached with evidence of his ties to the Mexican Mafia because he had testified that he was not concerned about elevating his status within any gang, particularly when he was in jail. The prosecutor specifically sought to impeach Duenas with his jailhouse calls about his drug smuggling activity, including calls with a secretary of the Mexican Mafia, and to present a rebuttal expert on the Mexican Mafia to provide a context for the calls. The prosecutor noted that, in one jailhouse call, the secretary told Duenas: "[T]he reason that you were paid position and all, that extra shit was only because you were going to be helping us out. If that's the case, if you're not going to go ahead and let us do that, just let us know right now. That way we can cut this short." In another call with his girlfriend, Jessica Parades, Duenas talked about his opportunity to become in charge of his jail dormitory once he obtained permission from certain high-powered inmates on another floor. The trial court ruled that the proffered evidence was admissible to impeach Duenas's testimony that he was not interested in status, and explained: "The one key word I agree with the People that impeaches him is [Duenas] testified that he was not interested in status, but the secretary from La Eme told him 'this is why you're getting paid, and your position --' the key word is position. That's why he got the position."

When cross-examination continued, Duenas testified that he smuggled drugs into the jail solely for himself and not for any gang. He denied that he ever smuggled drugs to elevate his status in the jail or to assume a position of power in his dormitory. Duenas testified that, once he began selling drugs, he had to pay a share to a "higher authority" in the jail or "something would happen" to him. He also stated that he had to take over "somebody's spot" as a "shot caller" in his dormitory because he was obligated to do so, but he denied that a shot caller was a person of power in the jail. The prosecutor then introduced an audio recording of Duenas's jailhouse call with the secretary of the

25

Mexican Mafia. Duenas admitted to the conversation, but denied he knew the caller was an influential member of the Mexican Mafia when he spoke to her.

At a sidebar conference, defense counsel moved for a mistrial based on the introduction of evidence about the Mexican Mafia. Defense counsel contended that the evidence was irrelevant and unduly prejudicial to Duenas's credibility. The prosecutor countered that Duenas repeatedly had denied that he sold drugs in jail to elevate his status within a gang, and instead had claimed that he was forced into a position of power in the jail. The trial court denied the motion for a mistrial. The court ruled that the evidence regarding the Mexican Mafia was admissible for impeachment purposes and that the probative value of the evidence outweighed the risk of undue prejudice. The prosecutor thereafter introduced audio recordings of another jailhouse call that Duenas had with the Mexican Mafia secretary, and a call that he had with Parades about becoming a shot caller in his dormitory. The prosecutor also called a rebuttal expert to testify about the structure and hierarchy of the Mexican Mafia in the jail facility where Duenas was housed.

## B.     Relevant Law

"[W]e review a ruling on a motion for mistrial for an abuse of discretion, and such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) Stated otherwise, "'"'[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. . . .' [Citation.] . . ." [Citation.]' [Citation.]" (*People v. Harris* (2013) 57 Cal.4th 804, 848.)

As discussed, evidence of gang membership and activity generally is admissible if it is logically relevant to a material issue in the case, is not more prejudicial than probative, and is not cumulative. (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 223.) As a general matter, application of the ordinary rules of evidence does not impermissibly

26

infringe on a defendant's constitutional rights. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.) "To prove a deprivation of federal due process rights, [the defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]" (*People v. Albarran*, *supra*, at p. 229.) Hence, "[t]he admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.)

## C. The Motion for a Mistrial Was Properly Denied

Even assuming, without deciding, that the evidence of Duenas's ties to the Mexican Mafia was more prejudicial than probative under Evidence Code section 352, the admission of the evidence did not render his trial fundamentally unfair. As discussed in detail in section III.C. above, there was compelling evidence of Duenas's guilt on each of the underlying charges and on each of the gang enhancements that the jury found to be true. In particular, Duenas admitted at trial that he committed the acts constituting the charged crimes of unauthorized carrying of a firearm, receipt of stolen property, and residential burglary, and that these were the types of crimes commonly committed by members of RBG for the benefit of the gang. Duenas also admitted that he shot Spencer with a semiautomatic gun following a series of physical confrontations between them and that he deliberately pointed the gun in Spencer's direction before firing the shot.

The record also reflects that the trial court instructed the jury that it could consider the evidence of Duenas's gang activity only for the limited purpose of evaluating his credibility as a witness and deciding whether he acted with the requisite knowledge or intent for the gang-related crimes and enhancements that were charged, and that the jury could not conclude from such evidence that Duenas was a person of bad character or had a disposition to commit crime. We presume that the jury understood and followed the

27

trial court's instruction.  (*People v. Scott* (2015) 61 Cal.4th 363, 399; *People v. Lindberg*, *supra*, 45 Cal.4th at p. 26.)  The fact that the jury deadlocked on certain gang enhancement allegations further suggests that the evidence of Duenas's Mexican Mafia ties did not have an inflammatory impact on the verdict.  Under these circumstances, Duenas's motion for a mistrial was properly denied.

## V.      Sentencing Error

Lastly, Duenas contends, and the Attorney General concedes, that the abstract of judgment erroneously refers to Duenas's conviction on count 1 as "Attempted Willful, Deliberate, and Premeditated Murder."   Because the jury did not find the premeditation allegation on count 1 to be true, the abstract of judgment should instead reflect that Duenas was convicted of "Attempted Murder."  We accordingly modify the abstract of judgment to correct the error.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## DISPOSITION

The abstract of judgment is modified to reflect that Duenas was convicted on count 1 of "Attempted Murder," and not "Attempted Willful, Deliberate, and Premeditated Murder."  As modified, the judgment is affirmed.


ZELON, J.


We concur:


PERLUSS, P. J.



BLUMENFELD, J.[*]

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28